Good morning, everyone. Good morning. Good morning. Judge Rawlinson and I would like to thank and acknowledge Judge Leslie Kobayashi. She's visiting and sitting with us. She's from the District of Hawaii, and we're very appreciative that she would take time from her busy schedule to join us and to help us out. Thank you, Judge Kobayashi. Thank you. Okay. Our first case for argument is going to be number three on the calendar. The first three cases, United States v. Alvarado, DeGaulle v. Barr, and Zee v. Barr, are all submitted on the briefs and records. So first case for argument is Krstic v. Barr, number 17-72542. Counsel. Good morning, Your Honor. It's David Tromloop for Petitioner. I have shared with the court what I filed this morning, that Mr. Krstic is terminal. He has brain cancer. He's dying. So his last wish and my job today is to clear his name. That's why we're here today. He certainly could opt for just dying in peace and not going forward with this petition, but he doesn't want what has happened to him and his family for the last four years to happen to another person. And we're not even talking about what happened in Bosnia. What happened in Bosnia was horrific. There's no question about that. But what I want the court to look at today is how do we go from several receipts for fuel and his very minor role to being characterized as somebody who committed and is part of the genocide bar, the persecution bar, and is forever barred from getting any relief. I think something that is amiss here is that we have repeatedly talked about this pre-sentence report and what the U.S. Attorney said. Let me add to this. The reason it was shocking to see a decision by the IJ or the BIA that he had no relief available wasn't that Mr. Kristic was thinking he's not going to be subject to removal. That was made clear. But the shocking part was that he would be barred from any relief. He was hoping that besides asylum, withholding, or CAT, that he would have his day in court to show the equities of his life, what he's done here for all these years. Counsel, you realize that we are not making the initial decision today. I understand. We are reviewing the agency decision. And so what is our standard of review here? Your Honor has to decide whether or not substantial evidence supports the finding that his involvement with fuel acquisition here is enough to meet the burden that he is subject to the persecution bar. And I want to start with Roger Pauly, the BIA's decision, because that's what you're reviewing. Before we go there, so that standard means that the evidence must compel the result that you're asking us to reach. Correct, Your Honor. Let me ask you, do you think the BIA made any legally erroneous decisions? Absolutely. As opposed to factual decisions that Judge Rawlinson is referring to? Absolutely, Your Honor. Well, I mean, if you're asking us to, for example, there's the adverse credibility determination, right? Correct. And we could only set that aside if there were two things, one, legal error in that making that decision, or it's not supported by substantial evidence. And if you're following up on Judge Rawlinson's question, the standard of review for substantial evidence is pretty tough. I understand, Your Honor. But let's look at the BIA decision, because this is what the Court is looking at. Let's look at the credibility issue that's before the Court. The credibility issue that was decided by the judge heavily was relied upon this expert testimony that the government brought. They brought Mr. McQueen to testify that it's not plausible that he didn't know that this fuel or ammunition was going to be used to massacre the Muslims who had been rounded up. Even Mr. McQueen says, even the Board says, and I point to the record at 207, so let's look at this together, because we are looking at the issue of credibility. Even Mr. McQueen says that he stated that the order for the fuel would likely have been communicated to someone senior to the respondent. That's the petitioner, my client. And that it was possible that the respondent was not told how the fuel was going to be combat operations going on at the time. The genocide was well known to that brigade. We are imputing knowledge to my client by an expert who clearly says it's possible he didn't know. But, you see, the I.J. is entitled to draw reasonable inferences from the evidence that he hears that's credible. And he found Mr. McQueen's report and testimony to be credible. You put a lot of weight on it. Your Honor, we're not addressing whether Mr. — I don't dispute Mr. McQueen is credible. I think he's credible. He's an expert. But to tie these inferences, it even bothered the dissenting board member. This is Roger Polley, who is a very conservative board member. I don't know if the courts were with his decisions. He even goes on to say, while the respondent is morally culpable, he's not probably found subject to the persecution bar because his unchallenged actions were merely peripheral to the persecution that occurred, similar to a military cook who prepares meals for troops he knows are committing atrocities. Counsel, that just shows there was a difference of opinion regarding the effect of the testimony. Can that meet the substantial evidence standard? I think it's more than — I think what Roger Polley is saying is more than different minds can differ in opinion. He's talking about the burden of proof. He's talking about what was presented here. But he's in the minority, though. I understand that. And that's why we're here. This Court needs to decide. When the board goes from — let me back up, give you some background. The board, while they were deciding this case that was unpublished, they decided two cases that they published regarding two Bosnians. One was a commander who was in charge of 200 troops, and he was clearly found to be subject to the persecution bar, where he participated in genocide, and he was brought from our relief. The other person was involved in the secret police or special police in Bosnia. His involvement was great. How does the board go from very little evidence? I mean, there's 5,000 pages of documents here. But when you look at the judge's finding, Your Honor, the judge says the ammunition and the diesel fuel receipts are the only documents — we're talking burden proof. This is not a difference of opinion. Are the only documents that connect Respondent to the genocide in Srebrenica, only. And then in May and September of 2017, the board decides those other published decisions. Counsel, what was your answer to Judge Pius's question regarding whether or not you were asserting legal error? Yes, we are. What's the legal error? The legal error is that instead of looking at the evidence under the substantial evidence rule, the board did a de novo review here of the judge's decision. They even decided that when they looked at the ammunition receipts and they looked at the fuel receipts, they were not even convinced that the fuel receipts were any evidence that the judge would have used. Let me ask you this. I guess what I had in mind about legal error, do you at all question the way in which the board or the IJ applied our recent cases addressing the persecutor bar, Kumar, and the earlier one, Alvarado? Alvarado has a two-step test. That's the standard that we need to apply, the legal standard in which we evaluate the IJ and the BIA's decision, the agency's decision. Correct, Your Honor. It appears that insofar as the Alvarado case is concerned, I don't follow in the BIA decision the two-part test that Alvarado has set forward. I can say that the BIA has gutted that decision recently. They don't go to the second step of Alvarado. So I can say that. But in terms of the BIA's decision here, I don't see a cogent two-step test of how my client's involvement met the standard for him to be subject to the persecution – the persecutor bar. You mean at the get-go? At the get-go. Well, it only takes just some evidence to invoke the persecutor bar. It's a very low standard. And then the burden shifts to the petitioner or to the applicant to show that he was not involved in any of the prohibited activities. And that's exactly why I said it wasn't a difference in opinion when the board member dissented, is that that shifting part has never been contested. The government never – when the shifting part occurred – Well, my understanding was that the petitioner did not contest that the government had presented some evidence, sufficient – enough evidence to shift the burden to him to prove by preponderance the evidence that he was not involved. And I believe – And then you apply the standard set forth in Alvarado and in Kumar. And I believe that he did meet his burden, that he wasn't involved, that any evidence that was raised by Mr. McQueen did not directly impact him, no matter how many pages of testimony, no matter how many conviction records they brought from the International Court. It doesn't matter. So for personal involvement, I gather it's your position, just because he was back at the headquarters or whatever it's called, I can't – I don't – As you said, the record here was 5,000 pages. Yes. Just because you are – But he was back at the office. Let's just put it that way. Right. Right? And he signed these requisitions. Yes. And they're imputing to him that he should have heard, he should have known, or he knew what these fuel or ammunition were being used for. And that's a stretch. When the BIA clearly is looking at cases where people were directly involved, they had command and control over soldiers. But, counsel, wasn't there evidence in the record that at headquarters, that was all that was being discussed, was that this mission, that the fuel was being used for this mission? And so why isn't it reasonable to infer his knowledge? If he was at headquarters and there was all of this discussion about what the fuel was he knew, based on all of this conversation, what it was going to be used for. What's wrong with that inference? There's nothing wrong with that inference if you imagine the headquarters is like this courtroom, where everybody's here and everybody hears what everybody's saying. But headquarters, this is a building. He's in charge of the motor pool, the cars. It's in a different location. It's a stretch. It's a lot to assume that because it was discussed at headquarters, a lowly clerk who is conscripted into this horrible war heard and knew that as he's putting his pen to these receipts. Was he a lowly clerk, counsel? He was. What was his rank? So there's a dispute about what his rank. My client believed he had no rank. He was conscripted into the military, into this horrible war. Because he had educational background, he was told that you're going to be in charge of this unit. What was the evidence in the record regarding his rank? There was testimony by the expert that he was a lieutenant. Lieutenant colonel, I thought. Yes, lieutenant colonel was the rank. That's not a lowly clerk. No, but his job and what he was given, that's what he believed. That's what his job was. He had one person below him that answered to him. Not 100, not 30. And he was countersigning these receipts that came. And you have to understand, this is during the fog of war. There are legitimate operations going on on all sides. And to come in 20 years later and say you should have known or you were involved or it's likely you heard is a stretch. When we have all these other cases, where clearly people's hands were bloodied with the murder of these other people. Why don't you save some time for rebuttal? Yes, Your Honor. Thank you. Good morning. Allison Igo, representing the Respondent. I'd like to answer a couple of the Court's questions. First, one, I don't believe there was legal error in the Board's decision. Do you read our cases as sanctioning basically constructive presence? Well, I don't think there was constructive presence. Well, he wasn't there where the genocide was taking place. Well, I don't think you have to be there. And I don't think that any of the Court's cases say that. The Court's cases say that your assistance. Well, let me ask you, was his role in all of this sort of integral to the persecutory end result? Well, my colleague has cited a case in which the Court said that, you know, feeding soldiers, you know, wasn't integral to the process. And I would say that soldiers can work on an empty stomach, but the trucks in this case did not move without the fuel and they didn't kill these people without the weapons. And that was his job. And I disagree that there is not, that there is no evidence in this record. There are two separate pieces of evidence. And this has nothing to do with the expert who testified. But there is, the expert did testify that the VRS kept very, very specific records because they had a tradition coming from the Yugoslavian Army. There is, and I believe that the administrative record site is 2785. I apologize. I did not bring the entire 8-volume record. Okay. So your argument about him actively assisting is the fact that what he did was integral to the persecution. Absolutely. And you can tell, there is evidence in the record that Popovich, who is considered the architect of this genocide, was overheard on a phone call screaming about needing 500 liters of fuel or he couldn't continue with his mission. Very shortly after, this petitioner signed a requisition for 500 liters, which they said was a very unusual amount of fuel. And, in fact, very many of the requisitions went above and beyond the normal use of both fuel and weapons during this period of time. So you're drawing some sort of inference because of the amount. But what you're really looking at is what he signed in terms of the value to the assistance. So you're saying even though you feed the soldiers, that's not actively participating. Well, this Court has found that, so I won't re-argue that case. Okay. But in this case, I would say that, you know, an army without fuel and without weapons could not have committed the genocide that they did in this case. And he was well aware. I'd also, I mean. Is it your point? Let me ask you this. When you say that, is your focus that they needed the trucks to transport the victims? Well, they transported them to the place that they killed them. Right. And then they used the weapons that were requisitioned to slaughter close to 3,000 people. Well, did they requisition weapons or did they requisition? What was it? I can't remember. I'm sorry. What were the requisitions for? The requisitions were for fuel and for weapons. And he was the chief technical services officer. He had, and it's in the record both in his letter of promotion and in the record from the VRS, his rank was major lieutenant colonel. You can see that the people who held this, you know, each had that before and after him, each had that rank. There were signed requisition slips. And there were his Zvornik Brigade members who were prosecuted at the international tribunal who testified that it was general knowledge. He, in fact, testified himself. An admission he attempted to walk back that he had heard them, you know, speaking about this. But this was a mission that took place over a period of a couple of weeks. It was, the testimony at the international tribunal was that it was generally celebrated, you know, as a great success. It's unbelievable that he, or at least the immigration judge found it wasn't believable. He wouldn't have at least known. No, assuming that he knew and the IJ found that he knew, as I read the IJ. Well, the IJ said that it wasn't believable that he didn't know. Well, that's the same thing, right? He must, you know, the IJ is inferring that he knew. Is that right? Yeah, virtually the same, yes. But is that still, does that still mean there's a knowledge sufficient to satisfy the integral component that we talk about in Kumar and Alvarado? Well, if you have the architect of the genocide screaming that he needs 500 liters of fuel to complete this mission, which is the genocide, and you have somebody who is the chief technical officer whose job it is to requisition that, then you would have to say that his job. Was his signature necessary for the fuel and the ammunition to be released? There's evidence in the record that says the only place that the fuel and weapons came out of was the headquarters, where he worked, and that his job was to sign the requisition orders. He had a supervisor, right? There's no evidence here that he did. I thought he did. I mean, he obviously must have had a supervisor, but he is pretty high. A major lieutenant colonel is a pretty high position. And he was chief of this division. So I'm sure he had, you know, in, I'm not familiar the way the military works generally, but I imagine he had some supervisor. But it was his job to sign these requisition orders. And there's also evidence in the record that, you know, during this period of time, there was an unusual demand for fuel and weapons. And if you are in charge of requisitioning supplies, that would raise some sort of question. And he admitted that he had overheard this. What sort of question? It would raise some sort of question? You would wonder why. I mean, you're responsible. Your signature is on these papers. You're in the military. Your signature is on these papers. You're held responsible for what is going out of the headquarters. Would it make a difference if his signature wasn't the only signature necessary to make sure that these requisitions are made? I don't think so. I mean, there are very many instances where two signatures are required. But I don't think that that would necessarily, you know, have an impact on his knowledge about, you know, what was happening with this, you know, the fuel and the weapons. I'd like to address, if the Court doesn't have any questions, I'd like to address a lot of questions, but go ahead. I assume you do. The adverse credibility. My colleague said that it was based on the expert testimony. And that isn't actually true. The Board relied on three separate things. One, evidence of his knowledge. Two, whether he lied about his training and whether he carried a gun. And the third one was his minimization of his job and his responsibilities. The first one, the IJ, you know, it was within his rights to find that his lack of knowledge in this case, you know, his claim of lack of knowledge was not believable. First of all, I would say, and something that the Petitioner has not explained, this man came in and filed a refugee application and put his address someplace else and denied his military involvement. If he were not concerned about those things and about what that would show, he would have just said, I served in the military, I was in a low position, and he would have put all of that. But he continued to lie about that all and was prosecuted for that, that misstatement. Let me ask you this. Let's assume that we would agree with you that the IJ's adverse credibility determination is supported by substantial evidence for the reasons you're just going through. What effect does that have on the other issues that are raised in the case? Well, the other issue is the persecutor bar and the genocide bar. And as you previously noted, there's a very low standard for initially triggering that bar. That is, the evidence has to indicate. And it doesn't matter. But as I read things, it looked like there really wasn't a dispute that the bar was triggered here. I don't think there was a dispute. So then we get into it. So then the bar then applies. Yes. But he has to negate it. So how does the adverse credibility determination fit into that analysis? Well, because he was found, it was the IJ and the board found his denials not credible, not believable, his knowledge not believable. And if the only thing that he has is his statement. Is it just so, but I want to, you seem to be suggesting that the knowledge was sufficient, his knowledge and his signing off on the requisitions. His knowledge, his position, you know, what his actions facilitated, which was the movement of these trucks. They moved the men and boys from one area to another where they were slaughtered. And without the fuel, they wouldn't have been able to do that. Without the weapons, they would not have been able to kill close to 8,000 people in the short period of time that they did. So it's not just his knowledge. It's that he facilitated the movement and the murder. Do you analogize this case to Alvarado? My colleague has said that the board gutted Alvarado. What's the best case you would say, judge, this is the case you should read that really demonstrates why this situation here? Well, that's a difficult question to answer because each one of these, each one of these cases is very specific to its own facts. And so you really can't say. We emphasized that, I think it was in Kumar. Yes, exactly. And I think you have to look at the facts in this case because the board did apply the personal involvement and purposeful assistance. There is no question that he was purposefully involved in this. He was recruited into the military. He accepted the promotion. He went to work every day. He was there. The records from the VRS show that he served on very crucial days when a lot of very specific people were killed in several different places. And he was on duty and signed requisition orders for fuel, you know, that was coincidental with those incidents. So I think that the evidence does show that there was purposeful involvement. Counsel, do you agree that we view all this under the substantial evidence test? Yes. The findings of fact are. My colleague said that the board had to use a substantial evidence test for the facts, and that's not actually correct. We use a substantial evidence test. You use. The board uses the clear error standard, and the court uses the substantial evidence standard for determining the facts in the case. So the underlying facts, the court would look at for substantial evidence. Do you consider the level of his knowledge to be a determination of fact? The level of his knowledge would be a determination of fact, yes. I would agree to that, yes. And I think that there's more than substantial evidence in here. I mean, starting with the fact that he has denied his rank, denied signing things or being responsible. He denied his residence because he knew that if he lived in Zvornik, that questions would arise about where he served his, you know, where his military service occurred. And then he denied his military service. And I think that those are all, you know, things that can be used to gauge his credibility and can be used against him. And then, you know, going on, it's very difficult in the context. As my colleague said, there's a fog of war. How could he have gone to work over a period of weeks, in and out of headquarters where they were moving? There's evidence that on one day, on July 14th, when he came into the headquarters, there's, you know, it shows that he worked that day, that there was a truck of Muslim men and boys that they could not move the night before parked in front of the headquarters. I mean, you know, with the evidence that this was celebrated as a great victory for the Serbs, it's, you know, in that context, I think that the evidence more than substantially supports the adverse credibility. And in that case, you know, when you look at the persecutor, he clearly, the burden shifted to him, and it was his burden by a preponderance of the evidence. And the only thing that he offered to the immigration judge was his denial that he knew what was going on. So let me ask you this. I want you to respond to this. In Kumar, we said, let's see, I think it's a page 999, we said, talking about purposeful assistance, we said, we examined whether the petitioner's acts were material to the persecutory end. Miranda Alvarado teaches that whether petitioner's assistance was material is measured by examining the degree of relation his acts had to the persecution itself. How instrumental to the persecutory end were those acts? Did the acts further the persecution, or were they tangential to it? So where do you put Mr. Christick's actions on that continuum? I would point the court to during the Brunjevo farm executions, the lieutenant colonel there, Lieutenant Colonel Popovich, he was chief of security of the Drina Corps. He was overheard on a phone call shouting that if he did not get additional fuel, his mission would come to a halt. Was Christick on that phone call? He wasn't on the phone call. But you asked me a question about whether his actions were integral. He had to supply, in order for that mission to continue, I mean, this is according to the lieutenant colonel who was, you know, the head of that operation. In order for that to continue, he had to sign a requisition to give them fuel and weapons. I know, but that's kind of a big leap between him saying that and the petitioner knowing that that was the end result. And unfortunately, history has shown us that you don't need fuel to take people and slaughter them in an area, right? So really what you're talking about is what's his knowledge with regard to connecting all the dots? That's not necessarily the fuel, but the end result, which was the slaughter. I would disagree with you in one sense. You don't need fuel, but they did transport them. So in this case, they needed it, because in this case, they transported them to areas where it was easier to kill them. And so they did use it in this instance. It may be that in other instances, the fuel wasn't important because it fueled other trucks and other things. But in this case, and again, I go back to my answer about very fact-specific. In this case, they transported these men and boys to very specific locations where they killed them. And the fuel was integral to that operation. My time has expired. If the Court does not have any further questions, I would ask that it deny the petition. Thank you very much. I think counsel has a minute and a half. I'll give you a minute and a half for rebuttal. Your Honor, it is a stretch to say that the head of operations screaming on the phone that he needs fuel or ammo is complicit with Mr. Christek here, that he was on that phone call, he had full knowledge, and he knew as he put his name on that slip and countersigned by somebody else that it was going to those fields where they murdered those innocent people. I understand the cause behind all this. We don't want people who have committed genocide and atrocities to be in the United States. The government has talked about how he lied about his military service to come here. But there's evidence in the record that was presented before the criminal judge in the U.S. District Court that talks about a lot of people, both on the Muslim side, the Serbian side, the Croat side, when they were seeking refugee status all over the world, including the United States, were guided to say, don't talk about where you lived, don't talk about being anywhere near any military service. And he pled guilty to that. He took responsibility for that, and the U.S. District Court judge acknowledged that, and they placed him on probation. That's not disputed. But to say that he lied about where he lived and thread that through everything else does not make him susceptible to the genocide bar and the persecutor bar. Thank you, Your Honor. Thank you, counsel. Thank you, counsel. We appreciate your arguments. The matter is submitted at this time.
judges: Paez, Rawlinson, Kobayashi